Jason M. Ingber (SBN 318323)
**LEVI & KORSINSKY, LLP**
3580 Wilshire Boulevard, Suite 1260
Los Angeles, California 90010-2513
Telephone: (213) 805-8373
Email: jingber@zlk.com

Mark S. Reich*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com

*Counsel for Plaintiffs*

**pro hac vice* forthcoming

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JORDAN PLEIN and RYAN SCHAVRIEN, individually and on behalf of all others similarly situated,<br>Plaintiffs,<br>v.<br>EQUITABLE HOLDINGS, INC.,<br>Defendant. | Case No.: '26CV5522 TWR DDL<br>**CLASS ACTION COMPLAINT**<br>**DEMAND FOR JURY TRIAL** |

Jordan Plein and Ryan Schavrien ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through Plaintiffs' undersigned counsel, brings this Class Action Complaint against Defendant Equitable Holdings, Inc. ("Defendant" or "Equitable"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1. The unauthorized collection and disclosure of a person's browsing activity, website interactions, personal identifiers, and device identifiers strikes at the most basic

expectation of privacy in one's online life. The misconduct is especially egregious where, as here, a company affirmatively represents to users that they may control whether their data is sold, shared, or tracked, then secretly sells, shares, and tracks that data anyway.

2. Equitable Holdings, Inc. owns and operates the website located at https://equitable.com (the "Website"), through which it provides users financial and retirement planning, customer support, assistance with filling benefits claims, searches for medical providers and general financial advice.

3. Like many modern websites, the Website displays a data privacy banner (the "Privacy Banner") and a cookie preferences interface (the "Cookie Settings") purporting to give users meaningful control over what data the Website shares with third parties.

4. Defendant's assurances are false. The Website begins placing and transmitting cookies and other third-party tracking technologies (the "Tracking Tools") capable of transmitting users' data the moment users visit the Website, before they can interact with the Privacy Banner or select their preferences in the Cookie Settings. The Tracking Tools transmit users' data to the advertising, social media, and analytics companies that designed and operate them, including The Trade Desk, Microsoft, Meta, Google, and LinkedIn (collectively, the "Tracking Entities").

5. Moreover, users, including Plaintiffs, were misled by Defendant's Privacy Banner and Cookie Settings, which inform users that they can reject all trackers and opt out of the sale of personal data and targeted advertising. The Website purports to let users manage their cookie preferences through the Cookie Settings. Specifically, users may: (1) click "Reject All" in the cookie banner to decline cookies; or (2) click "Opt out of sale of personal data and Targeted Advertising" to access the Cookie Settings, review and manage their selections, choosing among categories including "Strictly Necessary Cookies" and "Sale of Personal Data and Targeted Advertising," and click "Confirm My Choices." Yet even after users affirmatively reject all unnecessary cookies, the Website continues to deploy Tracking Tools that transmit users' data in real time to The Trade Desk, Microsoft, Meta, Google, LinkedIn, and LinkedIn.

6. The Tracking Tools collect detailed interaction and behavioral data, including users' selections of links, buttons, forms, and other on-page elements, as well as information entered into search fields. This data includes: webpages and products viewed; inferred interests, preferences, and other characteristics based on users' behavior and content engagement; personal, device, and technical identifiers such as device type, operating system, and browser type; persistent identifiers that enable recognition of users across sessions and websites; personal identifiers that associate users with individual profiles. Collectively, this information is referred to herein as "Sensitive Information," and it is collected the moment a user arrives on the Website.

7. By misrepresenting both the effectiveness of its tracking mechanism and users' ability to decline consent, Defendant deprives users of any real control over their Sensitive Information and their privacy.

8. Accordingly, Defendant violated the federal Wiretap Act, 18 U.S.C. § 2510, et seq.; California's Invasion of Privacy Act ("CIPA"), including Cal. Penal Code §§ 631 (illegal wiretapping) and 638.51 (unlawful use of a pen register or trap and trace device); and common law, including invasion of privacy, intrusion upon seclusion, fraud and deceit, and unjust enrichment. Plaintiffs bring this class action individually and on behalf of a putative class of similarly situated persons harmed by Defendant's deceptive and unlawful surveillance practices.

## **<u>JURISDICTION AND VENUE</u>**

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e). This Court has supplemental jurisdiction over the non-federal claims in this action. This Court also has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332 (d)(2)(A).

10. This Court has personal jurisdiction over Defendant because Defendant maintains a significant business presence and operation in the state, derives revenue in the State of California, including Defendant's revenue generated from its management over the Website, such as revenue sharing with retail partners and advertising sales, that Defendant derives from the Website.

11. Venue is proper in this Court because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

12. Plaintiff Jordan Plein is, and at all relevant times has been, a citizen of the State of California. Plaintiff accessed and used Defendant's Website while physically located in California.

13. Plaintiff Ryan Schavrien is, and at all relevant times has been, a citizen of the State of California. Plaintiff accessed and used Defendant's Website while physically located in California.

14. Equitable Holdings, Inc. ("Defendant" or "Equitable") is a Delaware corporation headquartered in New York, New York. Defendant owns and operates the website located at https://equitable.com.

## FACTUAL ALLEGATIONS

### I. Plaintiffs' Experience On The Website

15. Plaintiff Jordain Plein visited Defendant's Website regularly over the last 5+ years, visiting every three months to pay his father's life insurance. Plaintiff Plein maintained an account on Defendant's Website and used the Website to browse and manage life insurance payments. Plaintiff Plein maintains a Facebook account and was logged in on the same browser while using Defendant's Website.

16. In connection with his recent visit to Defendant's Website on or around June 2026, Plaintiff Plein was presented with the Website's Cookie Banner. Plaintiff Plein affirmatively clicked on "Reject All," in reliance on Defendant's representations that doing so would disable

non-essential advertising, analytics, and tracking technologies. Plaintiff Plein reasonably believed that his browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality. Plaintiff Plein always affirmatively rejects cookies from websites, as a matter of personal practice.

17. Despite Plaintiff Plein's rejection of the tracking technologies, Defendant deployed third-party Tracking Tools that intercepted and recorded Plaintiff Plein's browsing activity, account interactions, device identifiers, and related metadata, simultaneously transmitting the intercepted data to Tracking Entities. The intercepted communications disclosed the substance of Plaintiff Plein's communications with the Website, including the pages he chose to review while paying his life insurance, together with identifiers and related metadata. Plaintiff Plein believed that his browsing and payment activity was private.

18. Plaintiff Ryan Schavrien visited Defendant's Website on or around April 2025 and used the Website to browse information. Particularly, Plaintiff Schavrien browsed for Financial Advisors, using the "what we offer" and annuities tabs. Plaintiff Schavrien did not create an account or make any purchases on Defendant's Website. Plaintiff Schavrien maintains a Facebook account and was logged in on the same browser while using Defendant's Website.

19. In connection with his visit in April 2025 to Defendant's Website, Plaintiff Schavrien was presented with the Website's Cookie Banner. Plaintiff Schavrien affirmatively clicked on "Reject All," in reliance on Defendant's representations that doing so would disable non-essential advertising, analytics, and tracking technologies. Plaintiff Schavrien reasonably believed that his browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality.

20. Despite Plaintiff Schavrien's rejection of the tracking technologies, Defendant deployed third-party Tracking Tools that intercepted and recorded Plaintiff Schavrien's browsing activity, device identifiers, and related metadata, simultaneously transmitting the intercepted data to Tracking Entities. The intercepted communications disclosed the substance of Plaintiff Schavrien's communications with the Website, including the pages he chose to review while

looking for Financial Advisors and using the "what we offer" and annuities tabs, together with identifiers and related metadata. Plaintiff Schavrien believed that his browsing activity was private.

## II. How Websites Function

21. Websites are hosted on servers, meaning their files are stored on and accessed from those servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

22. When a user navigates to a webpage, by entering a URL directly or clicking a hyperlink, that user's browser contacts a DNS (Domain Name System) server, which translates the website's web address into a unique IP (Internet Protocol) address.[1]

23. An IP address is "a unique address that identifies a device on the Internet or a local network."[2]

24. When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by that IP address (the "Request URL").

25. The Request URL includes a domain name and path, which identify the specific content being accessed and its location within the website's structure. The Request URL typically contains parameters, values appended to a URL to transmit data to the recipient, prefaced by a question mark to signal their use, which direct the web server to provide additional, context-sensitive content.

26. By viewing a URL, an ordinary person can read these parameters and determine what choices a user made on a website, including the products or articles viewed, the phrases searched, and the substance of the user's communications with the website.

---

[1] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Sept. 25, 2026).

[2] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Sept. 25, 2026).

27. Website owners and web developers write and manage the URLs for their websites.

28. After the Request URL is sent and the server responds, the user's browser assembles the packets sent by the server back into the HTML code of the webpage. That code is processed by the browser as it arrives and rendered into the visual display according to the HTML's instructions, the visible, and usually interactive, website that most people think of.[3]

29. To provide more complex functionality, website developers embed commands written in other programming languages, such as JavaScript, within the HTML documents.[4]

30. Such code is used, among other things, to monitor and report users' activity. This code intercepts users' communications while they are in transit to a website, while a URL is being requested, and duplicates those requests, transmitting them to a first- or third-party server.

31. In short, the Internet relies on a constant, real-time exchange of requests and responses between a user's browser and a website's stored code and data. Critically, these requests and responses provide a near-complete record of everything a user does, and does not do, on a website, when and how they do it, and with what software and hardware.

## III. Defendant Programmed the Website To Identify and Track Users

32. Defendant voluntarily integrated Tracking Tools from the Tracking Entities into its Website's programming. Defendant's use of such Tracking Tools on its Website is performed pursuant to commercial agreements between Defendant and the Tracking Entities. These commercial agreements are formed to provide a commercial benefit to both the Defendant and the Tracking Entities.

---

[3] This processing of webpage data as it arrives is called "parsing," and allows web browsers to convert raw data received over the internet into structured data objects used by the renderer built-in to the browser to create images on the screen. This means that, unless a software command, like a Tracking Tool, is physically last to arrive at a device, it is loaded and executed before the communication has finished being received. *See Populating the page: how browsers work*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited September 25, 2026).

[4] *See JavaScript: Adding interactivity*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Sept. 25, 2026).

33. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website's server to a user's web browser and stored locally on the user's device. Cookies typically contain unique identifiers that enable a website to recognize and differentiate individual users. These cookie files are automatically transmitted back to web servers through HTTP requests, allowing the Website and Tracking Entities to identify the device making the request and to record a session reflecting how the user interacts with the Website, i.e., everything they view, click on, type, search for or even hover over.

34. First-party cookies are those placed directly on the user's device by the web server with which the user is knowingly communicating, in this case, Defendant's Website. First-party cookies are commonly used to recognize users across repeated visits to the same website and to track their on-site activity.

35. Third-party cookies are placed by domains other than the Website's domain, such as advertising or analytics domains. These third-party cookies contain unique identifiers that allow Tracking Entities to recognize and track individual users across different websites, including the Website, and across multiple browsing sessions.

36. As detailed further below, Tracking Tools, including first- and third-party cookies, that are placed on users' devices during interactions with the Website are subsequently used to intercept and record users' communications by the Tracking Entities, enabling them to surreptitiously track and collect Website users' Sensitive Information in real time.

37. Tracking Tools serve numerous commercial purposes, including: (i) analytics, such as measuring user engagement and Website performance; (ii) personalization, including remembering users' preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on users' profiles; and (iv) social media integration.

38. The Tracking Entities use Sensitive Information from users, such as Plaintiffs, to build detailed marketing profiles of users to enhance the effectiveness and efficiency of Tracking Entities' and Defendant's marketing efforts.

39. Because Defendant controls the Website's software code and determines which Tracking Tools are loaded onto users' browsers, Defendant has control over whether these Tracking Tools are placed and whether users' Sensitive Information is transmitted to Tracking Entities.

## IV. The Website Misrepresented That Users Could Control the Collection and Disclosure of Their Sensitive Information

40. Defendant displayed a Privacy Banner and Cookie Settings on the Website. The Privacy Banner and Cookie Settings represented that users could make material choices about what tools were used on the website and how their data was shared with third parties. Plaintiffs relied on these representations when on the Website. However, these representations were materially false and misleading.

41. When users visited the Website, the Website immediately displayed a Privacy Banner stating: "This website uses tracking technologies to enable our website functionalities, to enhance user experience or to analyze performance and traffic. We may also share or sell information about your use of our site with our social media, advertising, and analytics partners. This allows us to perform targeted advertising and to select ads and content that will be more relevant to you. Below you can Accept Default Settings, Reject All trackers, or exercise your right to opt -in or -out of the sale of personal data, targeted advertising, profiling, and the processing of sensitive data by clicking on 'Manage Your Privacy Choices.' For more details on the data we process and how to exercise your rights, see our Privacy Policy. Cookie Policy."[5] The cookie banner provided users with options to click "Opt out of sale of personal data and Targeted Advertising," "Reject All," or "Accept Cookies" to manage their cookie preferences.[6]

42. When users clicked "Reject All" the Privacy Banner disappeared.

---

[5] *See Figures 1* and *2*, which depict Defendant's Privacy Banner and Cookie Settings.
[6] *Id.*




*Figure 1 – The Website's Privacy Banner representing that users could change the Website's tracking behavior*

43. Website users who selected the "Opt out of sale of personal data and Targeted Advertising" option were presented with the Cookie Settings, which represented that users could control how their Sensitive Information was collected and shared by accepting only "Strictly Necessary" cookies.[7] The Cookie Settings provided users with options to toggle of the "Sale of Personal Data and Targeted Advertising," click "Allow All," "Reject All," or "Confirm My Choices."[8]

[7] *Id.*
[8] *Id.*




*Figure 2 – The Website's Cookie Settings, representing that users could change the Website's tracking behavior*

44. The Cookie Settings further represent that "Strictly Necessary" cookies are necessary for the Website to function:

> Strictly Necessary Cookies
>
> These cookies are necessary for the website to function and cannot be switched off in our systems. They are usually only set in response to actions made by you which amount to a request for services, such as setting your privacy preferences, logging in or filling in forms. You can set your browser to block or alert you about these cookies, but some parts of the site will not then work. These cookies do not store any personally identifiable information.

45. The Cookie Settings further represent that "Sale of Personal Data and Targeted Advertising" is used for analytics and advertising:

> Sale of Personal Data and Targeted Advertising
>
> Third party trackers collect information to use for analytics and to personalize your experience with targeted ads. Under the Colorado CPA, the Virginia CDPA, the Texas DPSA, the Oregon CPA, the Montana CDPA, and the Florida DBR, you have the right to opt-out of the sale of your personal data to third parties, of targeted advertising related processing, and of some types of profiling. You may exercise your rights by using the toggles below. If you opt out, the ads and content that you

> see may not be as relevant to you. Under the Colorado CPA, you have the right to opt back in to these categories at any time should you initially choose to opt out, and you may do so using the same toggles provided below. For more details on the data we process and how to exercise your rights, and to view information related to required opt-in disclosures, see our Privacy Policy.

46. The Cookie Settings further represent that "Targeting" cookies are used to serve advertising content:

> Targeting Cookies
>
> These cookies may be set through our site by our advertising partners. They may be used by those companies to build a profile of your interests and show you relevant adverts on other sites. They do not store directly personal information, but are based on uniquely identifying your browser and internet device. If you do not allow these cookies, you will experience less targeted advertising.

47. The representations made by Defendant in the Privacy Banner and Cookie Settings led Plaintiffs, and would reasonably lead all Website users similarly situated, to believe that they had disabled all but necessary cookies. The Privacy Banner and Cookie Settings further reasonably led Plaintiffs and all reasonable users to believe that Defendant would not allow Tracking Entities, through cookies or similar technologies, to access users' Sensitive Information. Plaintiffs acted on those representations by interacting with the Website after making privacy selections intended to reject any sharing of Plaintiffs' personal information and use of any Tracking Tools other than essential cookies.

48. However, Defendant did not abide by Plaintiffs' expressed preferences and does not abide by users' expressed preferences generally. When users choose to decline all unnecessary cookies, they clearly communicate that they do not consent to the placement or transmission of cookies other than those required for functionality. Nevertheless, Defendant continued to cause the Tracking Tools, including cookies, to be placed or otherwise accessed on users' browsers and devices so that the Tracking Entities could intercept, transmit, and use users' Sensitive Information in real time.

## V. Defendant's Website Uses Tracking Tools

49. Defendant operates the Website and has installed Tracking Tools on the Website created by Tracking Entities. These Tracking Tools operate invisibly, tracking Website users' activity surreptitiously by intercepting users' Sensitive Information in real time as it arrives at or is sent from users' devices, copying the contents of those communications, and generating new Request URLs that are transmitted to the Tracking Entities.

50. Generally, the Tracking Tools function by intercepting users' communications, including Plaintiffs' Sensitive Information, in transit when they take certain actions on the Website. These actions include when they click on a link or load any page on the Website.

51. The Tracking Tools use cookies and other identifiers to identify users, including Plaintiffs, when they visit the Website, including users who never made an account or purchase on the Website. The cookies allow the Tracking Entities to identify users, including the Plaintiffs when they visit the Website or any other website where the Tracking Tools are present.

52. The Tracking Tools allow Defendant and the Tracking Entities to materially benefit from Plaintiffs' Sensitive Information. Defendant uses Plaintiffs' Sensitive Information to improve their marketing and advertising, while the Tracking Entities use Plaintiffs' Sensitive Information for marketing and advertising on the Website and other third-party websites, improve their own services, including enhancing the algorithms uses to build their Tracking Tools, and to build personal profiles to advertise to users, including Plaintiffs.

## VI. The Meta Pixel

53. Facebook offers its own tracking pixel known as the Facebook or Meta Pixel (the "Meta Pixel") to website owners for the purpose of monitoring user interactions on their websites, which can then be shared with Facebook.

54. The Meta Pixel is a marketing tool that can only be added to a webpage by website developers. A website operator must sign up for a business account or link a related Facebook account with its Pixel and then add code to the website to make use of the Meta Pixel.[9]

55. Upon creating a Meta Pixel, a Pixel ID (also called a DataSet ID by Meta) is generated. This Pixel ID is used to initialize the Meta Pixel, either by allowing Meta to fetch a predetermined library of code related to that ID, or otherwise by identifying the website owner's Facebook account used to receive the collected data when programming the Pixel directly into a website.[10][11]

56. This Pixel ID must match a known Pixel ID in Meta's system, and is transmitted by the Meta Pixel.[12]

57. As Facebook notes, the Meta Pixel must be added to each individual page that a website owner wishes to be tracked.[13]

58. Defendant places the Meta Pixel on the Website to gather, collect, and then transmit user information to Facebook. Defendant and Facebook use this information to build valuable personal profiles for Website users to inform their targeted advertising campaigns, enhancing marketing effectiveness and increasing the chance of converting users into paying customers. Defendant directly benefits from the use of the Meta Pixel by using these profiles for advertising. [14]

---

[9] *Setup and install the Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Sept. 25, 2026).

[10] *Id.*

[11] *Get Started with the Meta Pixel*, FACEBOOK (updated June 30, 2026) https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Sept. 25, 2026)

[12] *Meta Pixel*, FACEBOOK (updated Nov. 15, 2023) https://developers.facebook.com/docs/meta-pixel/ (last visited Sept. 25, 2026).

[13] *Get Started with the Meta Pixel, Facebook*, (updated June 30, 2026) https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Sept. 25, 2026)

[14] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and to share a tracked user's data with Facebook. *See Meta Pixel*, FACEBOOK (updated Nov. 15, 2023) https://developers.facebook.com/docs/meta-pixel/ (last visited Sept. 25, 2026).

59. The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location, and finding the people who are most likely to take action and view content. [15]

60. Once implemented on a website, the Facebook Pixel begins to share users' information the moment a user lands on the website.

61. When a Facebook user logs onto Facebook, tracking cookies, including the "c_user" cookie, the data cookie, and the "fr" cookie, are automatically created and stored on the user's device. These cookies allow Facebook to link the data it receives through the Meta Pixel to individual Facebook users.[16]

62. The c_user cookie, for example, contains a series of numbers (the user's Facebook ID, or "FID") to identify a user's profile.

63. The Meta Pixel tracks user activity on web pages by monitoring events, which, when triggered, causes the Pixel to automatically send data, users' Sensitive Information, directly to Facebook. Examples of events utilized by websites include a user loading a page with a Pixel installed (the "PageView event").[17][18][19][20] The Website utilizes the "PageView event".

64. The Meta Pixel also transmits Defendant's unique Pixel ID via the "id" parameter, which contains Defendant's Pixel ID of "579405831003398" for the purpose of matching the

---

[15] *See Audience ad targeting*, FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited Sept. 25, 2026).

[16] *Cookies Policy: What are cookies, and what does this policy cover?*, FACEBOOK (Dec. 12, 2023) https://www.facebook.com/policy/cookies/ (last visited Sept. 25, 2026).

[17] *About Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Sept. 23, 2026).

[18] *Id.*

[19] *Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Sept. 25, 2026).

[20] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About the Meta Pixel Helper*, FACEBOOK, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited Sept. 25, 2026).

harvested data to Defendant's Website.

65. Facebook independently benefits from the data collected through the Meta Pixel by using the harvested data to sell targeted advertising services. Facebook benefits from intercepting and analyzing users' Sensitive Information by refining its marketing algorithms and improving the effectiveness of its ad sales to all advertisers through Meta's social media platforms to target Meta's users, profiting from the ability to more accurately target potential customers.

66. Meta admits that it shares users' Sensitive Information with third parties,[21] just as Plaintiffs' Sensitive Information was shared here.

67. Defendant's use of the Facebook Pixel on the Website is demonstrated by the screenshots below:




*Figure 3 – The Meta Pixel intercepting a user's communication on the Website*

[21] *See Privacy Policy*, META (Jul. 23, 2026) https://www.facebook.com/privacy/policy?section_id=4-HowDoWeShare (last visited Sept. 25, 2026).




*Figure 4 – Information captured by the Meta Pixel intercepting a user's communication on the Website*




*Figure 5 – Cookies transmitted to the Meta Pixel on the Website*

68. When a business applies to use the Meta Pixel, it is provided with details about its functionality and its impact on private information. Plaintiffs and Website users, however, are not provided this information and would have no reason to look for it, as they are not a party to Defendant's agreement with Facebook.[22]

69. To make use of the Meta Pixel, Defendant agreed to Facebook's Business Tool Terms (the "Facebook Terms").

70. The Facebook Terms inform website owners using the Meta Pixel that the employment of the Meta Pixel will result in data sharing, including with Facebook, through the automatic sharing of Pixel Event information and contact information.23

71. The Facebook Terms are transparent that Meta will use the Pixel Event information and contact information "to match the contact information against user IDs, as well as to combine those user IDs with corresponding [Pixel Event information]."[24]

72. Facebook directs parties implementing the Meta Pixel, here, Defendant, to encrypt request information before data can be shared.[25][26]

73. Facebook further provides Meta Pixel users, such as Defendant, guidance on responsible data handling and details how data is acquired, used, and stored, including which information is shared with Facebook.

---

[22] *See Get Started with the Meta Pixel*, FACEBOOK (updated June 30, 2026) https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Sept. 25, 2026). (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can their actions in the Facebook Ads Manager so you can use the data…. By default, the Pixel will track URLs visited [and] domains visited….").

[23] *Meta Business Tools Terms*, FACEBOOK (Nov. 3, 2025) https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Sept. 25, 2026).

[24] *Id.*

[25] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. Defendant has specifically chosen the Facebook Pixel method, which makes users' information visible. *See* id.

[26] *Id.*

74. Facebook educates or reminds Meta Pixel users of their responsibility to inform their users of their website's data sharing and specifically guides website owners to obtain the requisite rights, permissions, or consents before sharing information with any third party.[27]

75. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Meta Pixel and ignored Facebook's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

## VII. Microsoft UET

76. Microsoft offers Microsoft Advertising (formerly known as "Bing Advertising"), a platform where advertisers can display ads to consumers across the internet based on their search terms and interests. [28]

77. One of the software tools available through Microsoft Advertising is Universal Event Tracking ("UET"), which allows website owners, like Defendant, to allow Microsoft to track conversion events on a website, target specific audiences, and automate advertisement bidding. Defendant uses the information collected by UET to maximize the performance of the advertising on the Website.[29]

78. UET is a tag that is placed on a website. Once UET is installed, the tag reports all users' activity on the website to Microsoft Advertising.[30]

---

[27] *Best practices for privacy and data use for Meta Business Tools*, Meta, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited Sept. 25, 2026).

[28] *Bing Ads API Overview*, MICROSOFT, https://learn.microsoft.com/en-us/advertising/guides/?view=bingads-13 (last visited Sept. 25, 2026).

[29] *What is UET and how can it help me?*, MICROSOFT, https://help.ads.microsoft.com/#apex/ads/en/56681/2 (last visited Sept. 25, 2026).

[30] *What is UET and how does it related to conversion tracking and remarketing features?*, MICROSOFT, https://help.ads.microsoft.com/#apex/ads/en/53056/2-500 (last visited Sept. 25, 2026).

79. UET uses several cookies, which it stores and/or accesses on website visitors' browsers. These cookies include the MR cookie, the MUID cookie, which contains a globally unique ID assigned to a visitor's browser that identifies them, the _uetsid cookie, which contains a session ID, and the _uetvid cookie, which contains a unique ID for a unique website visitor.[31][32]

80. UET can collect a vast amount of data from website visitors. The MUID/GUID cookie and the visitor's IP address are always passed to Microsoft with every HTTP request from UET. UET can also collect:

- Event actions,
- Event categories,
- Event types,
- Browser language setting,
- Page URLs,
- Referrer URLs,
- Screen height,
- Session ID,
- The UET tag ID,
- A signed-in user's ID, and
- A visitor ID.[33]

81. Information collected by Microsoft UET is used to build custom audience. Audiences are created by segmenting users by personal characteristics and interests. Advertisers like the Defendant then use these groups to improve and target their advertising.[34]

---

[31] *Guid Struct*, MICROSOFT, https://learn.microsoft.com/en-us/dotnet/api/system.guid?view=net-10.0 (last visited Sept. 25, 2026).

[32] *What cookies does UET use?*, MICROSOFT, https://help.ads.microsoft.com/#apex/ads/en/53056/2-500 (last visited Sept. 25, 2026).

[33] *What data does UET collect once I install it on my Website?*, MICROSOFT, https://help.ads.microsoft.com/#apex/ads/en/53056/2-500 (last visited Sept. 25, 2026).

[34] *Universal Event Tracking*, MICROSOFT, https://learn.microsoft.com/en-us/advertising/guides/universal-event-tracking?view=bingads-13 (last visited September 25, 2026).

82. These audiences can be shared between advertisers that use Microsoft UET, allowing advertisers to track users between websites across the internet.

83. Microsoft uses the data collected by Microsoft UET for their own purposes. Microsoft claims ownership over all information collected by their customers and uses it to deliver Microsoft Advertising and improve its own services.[35]

84. Defendant's use of UET on the Website is shown in the figures below:




*Figure 6 – Microsoft UET intercepting a user's communication on the Website*

[35] *Microsoft Advertising Agreement*, MICROSOFT, https://help.ads.microsoft.com/Resources/Microsoft_Advertising_Agreement_Online_Terms_v.2026-09-01/en-us.pdf (last visited September 25, 2026).




*Figure 7 – Information captured by Microsoft UET intercepting a user's communication on the Website*




*Figure 8 – Cookies transmitted to Microsoft UET on the Website*

85. Microsoft informs UET-using websites that they are responsible for managing visitor consent. Websites are instructed to place the "_uetmsdns" cookie as a first-party cookie and set the value to 1 to stop events from firing and respect visitor consent choices, should they not accept the use of trackers.[36]

86. Defendant failed to place this cookie on the Website and did not stop UET events from triggering when visitors declined the use of cookies.

## VIII. Google Analytics

87. Defendant embeds Google Analytics in its Website to enable Google to intercept users' Sensitive Information.

88. Google Analytics ("GA") invisibly collects data about user interactions with a website, including link clicks, button clicks, form submissions, conversions, shopping cart abandonment, adding items to carts, removing items from carts, file downloads, scrolling

---

[36] *How can I stop UET events from being fired for users who request to restrict data sharing?*, MICROSOFT, https://help.ads.microsoft.com/#apex/ads/en/53056/2-500 (last visited Sept. 25, 2026).

behavior, video views, call to action performance, table of contents clicks, and other customizable events.

89. Google admits that it shares users' Sensitive Information with third parties, just as Plaintiffs' Sensitive Information was shared here.[37]

90. The data collected through GA is sent back to Google, which associates the activity with the website from which it was collected.[38] Notably, Google notifies web developers that they should provide "users with clear and comprehensive information about the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."[39]

91. In short, the use of GA involves specific data-collection practices, preconfigured settings, and known transmission paths for user data. Google acknowledges the legal risks associated with its tracking tools and explicitly shifts the responsibility for informing users and obtaining any required consent onto website operators like Defendant.

92. Here, Defendant added GA to its Website by (1) creating an Analytics account; (2) designating their Website as a property; (3) adding a data stream to determine what information to collect; and (4) adding GA to its website.

93. Defendant's use of GA on the Website is shown in the screenshots below:

---

[37] *See Privacy & Terms*, GOOGLE, https://policies.google.com/privacy?hl=en#infosharing (last visited Sept. 25, 2026).

[38] *About the Google tag*, GOOGLE, https://support.google.com/tagmanager/answer/11994839?hl=en (last visited Sept. 25, 2026).

[39] *Id.*




*Figure 9 – Google Analytics intercepting a user's communication on the Website (1 of 2)*




*Figure 10 – Information captured by Google Analytics intercepting a user's communication on the Website*




*Figure 11 – Cookies transmitted to Google Analytics on the Website (1 of 2)*

94. Google provides analysis and feedback, which helps Defendant monetize the collected information through targeted advertising.

95. On December 19, 2024, Google announced that organizations using its advertising products can use fingerprinting techniques beginning on February 16, 2025.[40]

96. "Fingerprinting involves the collection of pieces of information about a device's software or hardware, which, when combined, can uniquely identify a particular device and user," explained Stephen Almond, executive director of regulatory risk at the International Commissioner's Office ("ICO").[41]

97. Digital fingerprinting essentially creates a unique digital ID for a user and their device based on various pieces of information collected when users browse the internet, including

---

[40] Pieter Arntz, *Google now allows digital fingerprinting of its users*, MALWAREBYTES (Feb. 19, 2025),https://www.malwarebytes.com/blog/news/2025/02/google-now-allows-digital-fingerprinting-of-its-users (last visited Sept. 2319, 2025), https://www.malwarebytes.com/blog/news/2025/02/google-now-allows-digital-fingerprinting-of-its-users (last visited Sept. 25, 2026).

[41] Stephen Almond, *Our response to Google's policy change on fingerprinting*, INT'L COMMISSIONER'S OFFICE (Dec. 19, 2024), https://ico.org.uk/about-the-ico/media-centre/news-and-blogs/2024/12/our-response-to-google-s-policy-change-on-fingerprinting/ (last visited Sept. 25, 2026).

a user's operating system (e.g., Windows, Android, iOS), browser type (e.g., Chrome, Safari, Firefox) and version, IP address, installed browser plugins, time zone, and language settings, among others.[42]

98. In addition to device identifiers, fingerprinting collects all the websites and apps the user uses, creating a detailed map for Google to follow and analyze, enabling a profile to be built of everything a consumer likes and is likely to buy.[43]

99. Even Google has raised concerns about digital fingerprinting in the past, warning it "subverts user choice and is wrong."[44]

100. In changing its policy regarding fingerprinting, Google vaguely claims it is investing in privacy-enhancing technologies (PETs) to protect users' privacy, providing few specifics about how PETs do so.[45]

101. The ICO finds fingerprinting an unfair means of tracking users online, "because it is likely to reduce people's choice and control over how their information is collected."[46]

102. The ICO explains:

> [W]hen you choose an option on a consent banner or "clear all site data" in your browser, you are generally controlling the use of cookies and other traditional forms of local storage. Fingerprinting, however, relies on signals that you cannot easily

---

[42] Pieter Arntz, *Google now allows digital fingerprinting of its users*, MalwareBytes (Feb. 19, 2025), https://www.malwarebytes.com/blog/news/2025/02/google-now-allows-digital-fingerprinting-of-its-users (last visited September 25, 2026).

[43] Zak Doffman, *Google's Fingerprinting Returns in 8 Weeks And It Will Track Your Devices*, FORBES (Dec. 21, 2024 2:37 PM), https://www.forbes.com/sites/zakdoffman/2024/12/21/forget-chrome-google-will-start-tracking-you-and-all-your-smart-devices-in-8-weeks/ (last visited Sept. 25, 2026); Zak Doffman, *Google Starts Fingerprinting Your Devices in 10 Days*, FORBES (Feb. 8, 2025 1:32 PM), https://www.forbes.com/sites/zakdoffman/2025/02/08/forget-chrome-google-starts-tracking-all-your-devices-in-10-days/ (last visited Sept. 25, 2026).

[44] *Id.*

[45] *Id.*

[46] Stephen Almond, *Our response to Google's policy change on fingerprinting*, INT'L COMMISSIONER'S OFFICE (Dec. 19, 2024), https://ico.org.uk/about-the-ico/media-centre/news-and-blogs/2024/12/our-response-to-google-s-policy-change-on-fingerprinting/ (last visited Sept. 25, 2026).

wipe. So, even if you "clear all site data" the organization using fingerprinting techniques could immediately identify you again.[47]

103. As a result of Defendant's use of Google's GA tool, users, including Plaintiffs, lost control of their Sensitive Information and had marketing profiles developed through the use of their Sensitive Information, allowing Google and Defendant to benefit.

## IX. The Trade Desk Pixel

104. The Trade Desk is a demand-side platform ("DSP"), meaning it provides automation software to assist advertisers in purchasing advertisements. The Trade Desk provides advertisement purchasers with software tools to manage, analyze, and optimize digital advertising campaigns across multiple channels and inventory sources. As a DSP, The Trade Desk works with supply-side platforms ("SSPs"), which are used to manage the supply of advertising inventory for publishers and other entities that sell advertising space on their websites. The Trade Desk is integrated with many supply-side platforms that rely on advertising spend generated by advertisers using The Trade Desk.[48]

105. The Trade Desk offers technologies, products, and services designed to personalize the delivery of digital content to individual users. As to personalized advertisements delivered to users, Jeff Green, Chief Executive Officer of The Trade Desk, described Trade Desk's Unified ID 2.0 marketing technology as follows: "[w]e will have effectively solved the identity matching challenge of the entire open internet on a scale well beyond anything cookies

[47] Zak Doffman, *Google's Fingerprinting Returns in 8 Weeks And It Will Track Your Devices*, Forbes (Dec. 21, 2024), https://www.forbes.com/sites/zakdoffman/2024/12/21/forget-chrome-google-will-start-tracking-you-and-all-your-smart-devices-in-8-weeks/ (last visited September 25, 2026).

[48] *What is a demand-side platform* (DSP), ADJUST, https://www.adjust.com/glossary/demand-side-platform/ (last visited Sept. 25, 2026); *Trackers: The Trade Desk* (adsrvr.org), BETTER.FYI, https://web.archive.org/web/20241129195413/https://better.fyi/trackers/adsrvr.org/ (last visited September 25, 2026); *What is a Supply-Side Platform?*, PUBLIFT, https://www.publift.com/adteach/what-is-a-supply-side-platform (last visited Sept. 25, 2026).

have ever accomplished, and all while providing consumers with much greater control over their privacy."[49]

106. Among the tracking technologies offered by The Trade Desk and employed by the Website for tracking user behavior and collecting data for targeted advertising is the Trade Desk Universal Pixel ("TTD Pixel"). The TTD Pixel is enabled by placing TTD Pixel code within a website's code, which enables the capture of data on each page of the website and across multiple websites. Trade Desk's TTD Pixel is designed to collect and transmit user data that marketers use to measure, manage, and optimize programmatic advertising campaigns. [50]

107. The TTD Pixel, like other pixels, is a tracking tool that can be integrated with the Trade Desk's platform (the "Platform"). The TTD Pixel allows advertisers and site operators to "spend less time placing tags, gain more visibility into user data, and analyze reporting at a more granular level . . . all with the placement of a single tag."[51] The TTD Pixel collects information,

---

[49] *News Details: The Trade Desk Reports Fourth Quarter and Fiscal Year 2022 Financial Results; Announces $700 Million Share Repurchase Program*, THETRADEDESK: INVESTOR RELATIONS (Feb. 15, 2023) https://investors.thetradedesk.com/news-and-events/news/news-details/2023/The-Trade-Desk-Reports-Fourth-Quarter-and-Fiscal-Year-2022-Financial-Results-Announces-700-Million-Share-Repurchase-Program/default.aspx#:~:text=View%20all%20news-,The%20Trade%20Desk%20Reports%20Fourth%20Quarter%20and%20Fiscal%20Year%202022,%24700%20Million%20Share%20Repurchase%20Program&text=Q4%20revenue%20grew%2024%25%20year,over%20year%20to%20%241%2C578%20million. (last visited Sept. 25, 2026); Chris Kelly, *Trade Desk revenue up 24% as advertisers continue shift to CTV, retail media*, MARKETINGDIVE (Feb. 15, 2023) https://www.marketingdive.com/news/trade-desk-earnings-q4-ctv-retail-media/642825/ (last visited Sept. 25, 2026).

[50] *About The Trade Desk Universal Pixel*, TEALIUM, https://tealium.com/integrations/the-trade-desk-universal-pixel/ (last visited Sept. 25, 2026); *Universal Pixel*, THETRADEDESK, https://www.lockheedmartin.com/content/dam/lockheed-martin/eo/documents/contact/TTD_UniversalPixel_Overview.pdf (last visited Sept. 25, 2026); Mason Widmer, *4 Vital Best Practices for Using The Trade Desk + A Top Tip*, GRAPESEED MEDIA (Nov. 6, 2024), https://grapeseedmedia.com/blog/trade-desk-best-practices/ (last visited Sept. 25, 2026).

[51] The Trade Desk platform refers to the Trade Desk's self-service technologies for buying and managing digital advertising campaigns across various channels and formats (the "Platform"). The Platform allows advertisers to use data to better target specific audiences via the TTD Pixel and other technologies. The Platform also provides real-time bidding, where advertisers bid on ad impressions, and can access insights into impressions, clicks, conversions, and audience engagement metrics. The Platform enables cross-device advertising on smartphones, tablets, TVs,

including demographics, browsing behavior, and conversion events. The precise categories of information collected through the TTD Pixel in this case are described in further detail below. The TTD Pixel is not limited to computer or browser-based browsing; it is capable of collecting information from mobile platforms, including how a user interacts with mobile applications, and specific details regarding the mobile device being used to access the content and the applications.

108. An advertiser or website operator that uses the Platform to run campaigns can leverage the TTD Pixel to collect data regarding how users interact across websites, mobile applications, television, and other technologies.[52]

109. Defendant's integration of the TTD Pixel provides benefits to The Trade Desk and Defendant.

110. The first benefit provided by the TTD Pixel to The Trade Desk is data collection. This data allows The Trade Desk to segment user information to create target audiences and track conversions. For example, the TTD Pixel enables The Trade Desk to collect user data, including demographic information, browsing behavior, preferences, and interactions with websites. This data is then sent to an SSP, which analyzes bids from multiple DSP, such as The Trade Desk, and facilitates the targeting of users based on their information. The Trade Desk relies on this information for its business operations.[53]

---

and desktop computers. Overall, the Platform provides advertisers with advertising capabilities, audience targeting, real-time bidding, data analytics, and control over their digital ad campaigns. *See Universal Pixel*, THETRADEDESK, https://www.lockheedmartin.com/content/dam/lockheed-martin/eo/documents/contact/TTD_UniversalPixel_Overview.pdf (last visited Sept. 25, 2026); *What are Pixels and Why Do I Need to Use Them?*, AX INSIGHTS, https://audiencex.com/insights/what-are-pixels-and-why-do-i-need-to-use-them/ (last visited Sept. 25, 2026); *Privacy and The Trade Desk Platform*, THETRADEDESK, https://www.thetradedesk.com/us/privacy (last visited Sept. 25, 2026).

[52] *Id.*

[53] Erin Jeffery, *What are Pixels and Why Do I Need to Use Them?*, AX INSIGHTS (Sept. 3, 2020) https://audiencex.com/insights/what-are-pixels-and-why-do-i-need-to-use-them/ (last visited Sept. 25, 2026); Andy Pitre, *Ad Tracking: What It Is & How to Do It*, HUBSPOT: BLOG (updated Mar. 10, 2022) https://blog.hubspot.com/blog/tabid/6307/bid/7249/a-marketer-s-guide-to-tracking-online-campaigns.aspx (last visited Sept. 25, 2026); *Programmatic Advertising: Your Guide to DMPs, DSPs, and SSPs*, GROWTH MARKETING GENIE,

111. The TTD Pixel also enables the Trade Desk to retarget users by creating lookalike audiences, as the TTD Pixel is "essentially [] just storing a group of people and information about them."[54] A lookalike audience is a group of individuals who are likely to be interested in a business because they share similarities with the business's existing customers. By developing lookalike audiences, the Trade Desk enhances its ability to bid for advertising space from SSPs by identifying website users who are more likely to generate clicks or conversions based on shared characteristics with existing customers.

112. Finally, because Trade Desk's primary business model involves charging clients or advertising publishers a percentage of gross spending on the Trade Desk platform, improvements in advertising effectiveness increase Trade Desk's revenue. When advertising targeting efficiency improves by increasing advertising conversion rates (the rate at which clicks turn to sales) advertisers are more likely to shift additional business to Trade Desk, resulting in increased revenue derived from ad sales.[55]

113. Defendant's use of The Trade Desk on the Website is shown in the figures below:

---

https://growthmarketinggenie.com/blog/programmatic-advertising-dmps-dsps-ssps/ (last visited Sept. 25, 2026).

[54] Erin Jeffery, *What are Pixels and Why Do I Need to Use Them?*, AX Insights, (Sept. 3, 2020) https://insights.audiencex.com/what-are-pixels-and-why-do-i-need-to-use-them/ (last visited September 25, 2026).

[55] *What is a conversion rate (CVR)?*, ADJUST, https://www.adjust.com/glossary/conversion-rate/ (last visited Sept. 25, 2026); Trevor Jennewine, *How Does The Trade Desk Make Money?*, THE MOTLEY FOOL (Oct. 27, 2021 7:35 am EDT) available at https://www.nasdaq.com/articles/how-does-the-trade-desk-make-money-2021-10-27 (last visited Sept. 25, 2026).




*Figure 12 – The Trade Desk intercepting a user's communication on the Website*




*Figure 13 – Information captured by The Trade Desk intercepting a user's communication on the Website*




*Figure 14 – Cookies transmitted to and from The Trade Desk on the Website*

## X. The LinkedIn Insight Tag

114. Additionally, Defendant has installed a tracking tag on its Website created by the professional networking platform LinkedIn (the "LinkedIn Insight Tag").

115. The LinkedIn Insight Tag is a lightweight JavaScript code that, once embedded on a website, loads into a visitor's browser and records the visitor's interactions with the website, including page views, button clicks, form submissions, and conversion events.[56]

116. The LinkedIn Insight Tag is not implemented into websites by LinkedIn and requires several affirmative steps on the part of the website owner to implement and to effectuate its data sharing.

117. The LinkedIn Insight Tag begins capturing data the moment it loads in the user's browser, before any pop-up or cookie banner advises the user of the invasion or seeks the user's consent.

118. Through its Conversion Tracking and Audience Insights capabilities, the LinkedIn Insight Tag captures and transmits information when a user takes specified actions on the website,

---

[56] *LinkedIn Insight Tag overview*, LINKEDIN MARKETING SOLUTIONS HELP, https://www.linkedin.com/help/lms/answer/a489169 (last visited Sept. 25, 2026).

allowing the website operator to attribute those actions to specific LinkedIn advertising campaigns and to build audience segments for future targeting.[57]

119. Each event the LinkedIn Insight Tag captures is transmitted to LinkedIn's servers paired with member identifiers. The LinkedIn Insight Tag also transmits the URL of the page on which the event occurred, the page title, the user's IP address, and metadata describing the user's action. LinkedIn uses that information for Matched Audiences, conversion measurement, and demographic reporting.

120. The LinkedIn Insight Tag sets and transmits cookies that identify and track users across the LinkedIn advertising network. These include the li_gc, lidc, bcookie, and bscookie cookies.[58]

121. LinkedIn admits that it shares users' Sensitive Information with third and fourth parties, just as Plaintiffs' Sensitive Information was shared here.

122. To deploy the LinkedIn Insight Tag, Defendant agreed to LinkedIn's Marketing Solutions Terms and applicable Ads Agreement (the "LinkedIn Terms"). But the LinkedIn Terms are not provided to Website users.

123. The LinkedIn Terms place responsibility on the website operator to provide appropriate disclosures to users and to obtain any consent required by law before sharing user data with LinkedIn through the Insight Tag.[59]

124. LinkedIn makes clear that the onus is on the Defendant to provide all necessary transparency notices and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with LinkedIn.

---

[57] *Set up Conversion Tracking for Insight Tag conversions*, LINKEDIN, https://www.linkedin.com/help/lms/answer/a425606 (last visited Sept. 25, 2026).

[58] *LinkedIn Advertising Cookies*, LinkedIn, https://www.linkedin.com/legal/l/cookie-table (Aug. 26, 2026) (last visited Sept. 25, 2026).

[59] *LinkedIn Ads Agreement*, LinkedIn, https://www.linkedin.com/legal/sas-terms (Nov. 3, 2025) (last visited Sept. 25, 2026).

125. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the LinkedIn Insight Tag and ignored LinkedIn's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

126. Defendant's use of the LinkedIn Insight Tag on the Website is demonstrated by the screenshots below:




*Figure 15 – The LinkedIn Insight Tag intercepting a user's communication on the Website*




*Figure 16 – Information captured by the LinkedIn Insight Tag intercepting a user's communication on the Website*




*Figure 17 – Cookies transmitted to and from the LinkedIn Insight Tag on the Website*

## XI. The Tracking Tools Listed Above Intercepted and Disclosed Both the Contents of Plaintiffs' Communications With the Website, As Well as Their Personal Identifiers

127. When Plaintiff Plein paid his life insurance payments and browsed the Website, and when Plaintiff Schavrien browsed and searched thew Website for financial advisors, the Tracking Tools contemporaneously intercepted the contents of their communications which showed their actions on the Website, which is reflected and can be seen in the Transmitted URLs. The path and query string of these Transmitted URLs reflect the substance of a user's communication and therefore constitute content.

128. The Tracking Tools also intercepted and disclosed Plaintiffs' and Defendant's IP addresses, Defendant's personal identifiers for each Tracking Tool, and the cookies that individually identified Plaintiffs.

129. This interception, duplication, and transmission occurred inside Plaintiffs' browsers, before the communications fully reached users' devices, or before they were transmitted from users' devices, and therefore occurred while the communications were in transit, intercepted, read, duplicated, and retransmitted by the Tracking Entities, who were third parties to Plaintiffs' communications with Defendant.

## XII. Plaintiffs Did Not Consent to Third-Party Tracking

130. First, the Website's default settings permitted tracking to begin as soon as users arrived on the Website, before users could act on the Privacy Banner at all, including by selecting "Reject All" or clicking "Opt out of sale of personal data and Targeted Advertising" to manage their cookie selections.

131. Second, even when Plaintiffs did choose to reject unnecessary cookies, the Tracking Entities continued to collect and transmit users' communications with the Website after users opted out.

132. When Plaintiffs chose to reject unnecessary cookies, Plaintiffs relied on Defendant's representation that unnecessary cookies, including the cookies from the Tracking

Entities, would not be used to intercept their communications on the Website, and continued to browse and use the Website in reliance of that representation.

133. The figures below are exemplar images taken during counsel's investigation of the Website to show post-rejection tracking on the Website by an example browser.




*Figure 18 – Evidence showing Meta Pixel still intercepting user communications on the Website after cookies were rejected*




*Figure 19 – Information captured by the Meta Pixel intercepting a user's communication on the Website after cookies were rejected*




*Figure 20 – Evidence showing Meta Pixel still transmitting cookies on user's device after cookies were rejected*




*Figure 21 – Evidence showing Microsoft still intercepting user communications on the Website after cookies were rejected*




*Figure 22 – Information captured by Microsoft intercepting a user's communication on the Website after cookies were rejected*




*Figure 23 – Evidence showing Microsoft still transmitting cookies on user's device after cookies were rejected*




*Figure 24 – Evidence showing Google Analytics still intercepting user communications on the Website after cookies were rejected*




*Figure 25 – Information captured by Google Analytics intercepting a user's communication on the Website after cookies were rejected*




*Figure 26 – Evidence showing Google Analytics still transmitting cookies on user's device after cookies were rejected*




*Figure 27 – Evidence showing The Trade Desk still intercepting user communications on the Website after cookies were rejected*




*Figure 28 – Information captured by The Trade Desk intercepting a user's communication on the Website after cookies were rejected*




*Figure 29 – Evidence showing The Trade Desk still transmitting cookies on user's device after cookies were rejected*




*Figure 30 – Evidence showing LinkedIn still intercepting user communications on the Website after cookies were rejected*




*Figure 31 – Information captured by the LinkedIn Insight Tag intercepting a user's communication on the Website after cookies were rejected*




*Figure 32 – Evidence showing LinkedIn still transmitting cookies on user's device after cookies were rejected*

**TOLLING**

134. The statutes of limitations applicable to Plaintiffs' and the Class members' claims are tolled by Defendant's wrongful conduct and by Plaintiffs' and the Class members' delayed discovery of their claims. Defendant's acts were technically complex, and inherently self-concealing, thereby preventing Plaintiff and the Class members from discovering the unlawful disclosure of their Sensitive Information until recently.

135. Defendant, via its Privacy Banner, misrepresented its data sharing practices.

136. Defendant possessed superior and exclusive knowledge that the Tracking Tools of the Tracking Entities embedded within its Website would disclose Plaintiffs' and Class members' Sensitive Information in contradiction to Plaintiffs' cookie settings preferences.

137. Plaintiffs and the Class members could not, through the exercise of reasonable diligence, have discovered the full scope of Defendant's conduct and misrepresentations because the technology involved is highly technical and not reasonably discernible to ordinary users.

138. Plaintiffs and the Class members first became aware of Defendant's misconduct as a result of counsel's investigation and technical analysis conducted in advance of filing this Complaint, on or about September 23, 2026.

**CLASS ALLEGATIONS**

139. Plaintiffs bring these claims for relief pursuant to the Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the Class and the California Subclass.

140. Plaintiffs bring this class action individually and on behalf of the following Class:

All persons in the United States who visited the Website and did not affirmatively accept cookies (the "Class")).

141. Plaintiffs bring this class action individually and on behalf of the following California Subclass:

> All members of the Class who visited the Website while located in the State of California and did not affirmatively accept cookies (the "California Subclass").

142. Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

143. Plaintiffs reserve the right to amend the Class and Subclass definitions above if further investigation and/or discovery reveal that the Class should be expanded, narrowed, further divided into subclasses, or otherwise modified in any way.

144. NUMEROSITY: At this time, Plaintiffs do not know the number of Class members but believes the number to be at least measured in thousands, if not millions, given the popularity of Defendant's Website. The number of persons within the Class is believed to be so numerous that joinder of all members is impractical. The exact identities of Class members may be ascertained via the records maintained by the Defendant in the ordinary course of its business.

145. COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between the Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a. Whether Defendant shared the Class members' Sensitive Information with the Tracking Entities or other third parties and/or facilitated the Tracking Entities' interception of the Class members' Sensitive Information;
b. Whether Defendant obtained effective and informed consent to do so;
c. Whether Defendant's conduct constitutes a violation of the Wiretap Act; and
d. Whether the Class members are entitled to actual damages, punitive damages, and/or statutory penalties.

146. TYPICALITY: As persons who visited Defendant's Website and whose personal information was shared by Defendant, Plaintiffs are asserting claims that are typical of the Class members.

147. ADEQUACY: Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class members or whose inclusion would otherwise be improper are excluded.

148. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is impracticable and inefficient. It would be unduly burdensome on the courts, where individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for their wrongdoing as asserted herein.

## CAUSES OF ACTION

### COUNT I
### COMMON LAW INVASION OF PRIVACY
### Intrusion Upon Seclusion
### (On Behalf of Plaintiffs and the Class)

149. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

150. Plaintiffs bring this cause of action individually and on behalf of all Class members.

151. Defendant has intruded upon the legally protected privacy interests of Plaintiffs and the Class members by, among other things, permitting Tracking Tools to intercept and make use of users' Sensitive Information by compiling it with other user information gathered across the internet, while representing to users that they could decline such collection.

152. Plaintiffs and the Class members maintained a reasonable expectation that their communications with Defendant via the Website would remain private, specifically with respect

to their personal information, including browsing activity, device identifiers, and related metadata, which has been recognized as sensitive information. Plaintiffs expected that Plaintiffs' interactions with the Website would not be shared with third-party analytics providers.[60]

153. Plaintiffs and the Class members relied on Defendant's representations and exercised the Website's controls, reasonably expecting that Defendant would honor its affirmative representation in the Privacy Banner and Cookie Settings that users could decline unnecessary cookies.

154. Despite Plaintiffs' and the Class members' selections, Defendant permitted the Tracking Entities to use cookies and related Tracking Tools to collect and compile users' Sensitive Information, including the categories described above. The Tracking Entities used and profited from these data to create detailed user profiles, audience segments, and targeted advertising, and to share and monetize those profiles.

155. Defendant lacked any legitimate business justification for permitting the placement and transmission of third-party cookies and Tracking Tools that allowed the Tracking Entities to access, intercept, and collect users' Sensitive Information, contrary to users' express selections.

156. As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class members suffered injury, including but not limited to loss of privacy, loss of control over their personal information, diminution in value of their private data, and other compensable harms.

157. Plaintiffs and the Class members seek all available relief for this claim, including compensatory damages, restitution, disgorgement of profits, statutory and punitive damages where available.

---

[60] For example, California voted to pass the California Consumer Privacy Act of 2018 ("CCPA") and voted to amend the CCPA in 2020 through Proposition 24, the California Privacy Rights Act (CPRA). The CPRA sets out that collecting and using "personal information," including real names, online identifiers, internet browsing and search history, location data, audio and visual information, etc., requires businesses to provide adequate notice of such practices. *See generally*, Cal. Civ. Code §§ 1798.100, 1798.105, 1798.106, 1798.110, 1798.115, 1798.120, 1798.140(v).

**COUNT II**
**INVASION OF PRIVACY AND**
**VIOLATIONS OF THE CALIFORNIA CONSTITUTION, Art. 1, § 1**
**(On Behalf of Plaintiffs and the California Subclass)**

158. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

159. Plaintiffs bring this cause of action individually and on behalf of all California Subclass members.

160. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

161. California voters added the word "and privacy" to the California Constitution when they passed Proposition 11 in 1972. Proposition 11 is also known as the "Privacy Initiative" or "Right to Privacy Initiative." In support of Proposition 11, voters stated that: "The right of privacy is the right to be left alone. . . . . It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control the circulation of personal information. This is essential to social relationships and personal freedom."

162. Plaintiffs and the California Subclass members have a legally protected interest in their Sensitive Information, such as browsing activity, device identifiers, and related metadata, which Defendant violated by providing the Tracking Entities access to that data, enabling the interception of such communications.

163. Plaintiffs and the California Subclass members' protected interests arise from various statutes and common law, including, inter alia, the Wiretap Act, the CIPA, and the California Constitution, which protects privacy rights and includes the "ability to control circulation of our personal information."

164. The privacy rights of Plaintiffs and the California Subclass members were invaded through the interception and collection of their data, which included their Sensitive Information and other sensitive information, without first obtaining authorization or consent from Plaintiffs and the California Subclass members.

165. Plaintiffs and the California Subclass members had a reasonable expectation of privacy when communicating with Defendant's Website and thereby providing and/or transmitting their Sensitive Information. By causing third-party cookies and Tracking Entities to be placed on users' browsers and devices and by transmitting users' Sensitive Information to the Tracking Entities, Defendant violated their reasonable expectation of privacy.

166. Defendant's intrusion, placing third-party Tracking Tools and enabling the Tracking Entities access to users' Sensitive Information despite users' express rejection of such tracking, is and would be highly offensive to a reasonable person.

167. As a direct and proximate result of Defendant's intentional invasion of their privacy rights, Plaintiffs and the California Subclass members have been harmed and are entitled to compensatory, punitive relief.

**<u>COUNT III</u>**
**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631**
**(On Behalf of Plaintiffs and the California Subclass)**

168. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

169. Plaintiffs bring this cause of action individually and on behalf of all California Subclass members.

170. CIPA was enacted to curb "the invasion of privacy resulting from the continual and increasing use of" certain technologies determined to pose "a serious threat to the free exercise of personal liberties." CIPA extends civil liability for various means of surveillance using technology.

171. CIPA provides that a person is liable to another where, "by means of any machine, instrument, or contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

172. The Website, the Tracking Tools, and Plaintiffs' devices and browsers each qualify as a "machine, instrument, or contrivance, or…other manner" used to engage in the prohibited conduct at issue here. See Cal. Penal Code § 631(a).

173. Within the relevant time period, the Tracking Entities, including Meta, Microsoft, Google, The Trade Desk, and LinkedIn, through the use of the Tracking Tools, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiffs and the California Subclass members, contemporaneous with the communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California.

174. The information collected by the Tracking Tools was not for the sole benefit of Defendant. Within the relevant time period, Defendant aided, agreed with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here.

175. Plaintiffs and the California Subclass members did not authorize or consent to the tracking, interception, and collection of any of their electronic communications. Defendant's violations of Cal. Penal Code § 631 constitute invasions of privacy of Plaintiffs and the California Subclass members' respective rights to privacy.

176. As a direct and proximate result of Defendant's conduct, Plaintiffs and the California Subclass members suffered losses and were damaged in an amount to be determined at trial. CIPA imposes civil liability and statutory penalties for violations of Cal. Penal Code § 631.

## COUNT IV
## VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT
## Cal. Penal Code § 638.51
## (On Behalf of Plaintiffs and the California Subclass)

177. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

178. Plaintiffs bring this cause of action individually and on behalf of all California Subclass members.

179. California's Pen Register and Trap and Trace Law is part of CIPA, codified at Cal. Penal Code §§ 638.50-638.55.

180. A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

181. A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

182. Cal. Penal Code § 638.51(a) provides that "Except as provided in subdivision (b), a person may not install or use a pen register or a trap and trace device without first obtaining a court order pursuant to Section 638.52 or 638.53." No court order to install pen register or trap

and trace devices via the Tracking Tools was obtained by Defendant. Defendant uses pen register and trap and trace processes on its Website by deploying Tracking Tools designed to capture routing information, addresses, and other signaling information of website users. The Tracking Tools identify the source of the incoming electronic and wire communications to the Website.

183. Defendant was not authorized by any court order to use pen register or trap and trace devices to track Plaintiffs and the California Subclass members' activity on the Web. Defendant did not obtain consent from Plaintiffs or the California Subclass members before using pen register or trap and trace technology to identify users of its Website and has violated Section 638.51. As a direct and proximate result of Defendant's conduct, Plaintiffs and the California Subclass members suffered losses and were damaged in an amount to be determined at trial. CIPA imposes civil liability and statutory penalties for violations of Cal. Penal Code § 638.51.

**COUNT V**
**VIOLATIONS OF THE WIRETAP ACT 18 U.S.C. § 2510, et seq.**
**(On Behalf of Plaintiffs and the Class)**

184. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

185. Plaintiffs bring this cause of action individually and on behalf of all Class members.

186. The federal Wiretap Act prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. *See* 18 U.S.C. § 2511.

187. The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

188. The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

189. The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

190. The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

191. The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

192. Plaintiffs, Defendant, and the Tracking Entities are "persons" within the meaning of the Wiretap Act.

193. The Tracking Tools, Plaintiffs' devices and browsers, and Defendant's website server constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

194. Plaintiffs had a reasonable expectation of privacy in Plaintiffs' electronic communications with Defendant's Website, including the pages Plaintiffs viewed, browsing activity, and other interactions with Website features, particularly where Defendant represented through its Privacy Banner and Cookie Settings that users could reject all tracking and all non-required cookies.

195. Within the relevant time period, Plaintiffs' electronic communications with the Website were intercepted contemporaneously at the moment they were collected by the Tracking Tools and transmitted to Tracking Entities without Plaintiffs' consent from Plaintiffs' browser, for the unlawful purpose of monetizing the Plaintiff's intercepted information, including for combining that information with information collected about Plaintiffs from across the Internet via the same Tracking Tools and used for advertising, analytics, and marketing optimization.

196. Interception occurred whenever Plaintiffs interacted with the Website, including when Plaintiffs navigated webpages, viewed content, or otherwise communicated information to the Website through Plaintiffs' browsers.

197. At all relevant times, Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website and understood that doing so would result in the interception and transmission of users' communications to the Tracking Entities.

198. Plaintiffs did not consent to the interception, recording, disclosure, or use of Plaintiffs' electronic communications with the Website by the Tracking Entities. To the contrary, Plaintiffs affirmatively declined Tracking Entities' tracking through Defendant's Privacy Banner.

199. The unauthorized interception and use of Plaintiffs' electronic communications by the Tracking Entities were only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. 18 U.S.C. § 2511(1)(a).

200. Defendant intentionally intercepted the contents of Plaintiffs' and the Class members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state. For example, Defendant engaged in such conduct for unlawful and tortious purposes, including, for example, invasion of privacy, and associating the content of Plaintiffs and the Class members' electronic communications with preexisting consumer profiles and using the contents of their electronic communications in a manner that exceeds what Defendant promised Plaintiffs and the Class members on its Website.

201. Additionally, Plaintiffs' communications were fraudulently disclosed, and were obtained and used based off misrepresentations to Plaintiffs through the Privacy Banner.

202. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

203. As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiffs have been damaged and is entitled to relief under 18 U.S.C. § 2520, including:

a. damages in an amount to be determined at trial, assessed as the greater of the sum of the actual damages suffered by the Plaintiffs and any profits made by the violator as a result of the violation, or

b. statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000; and

c. reasonable attorneys' fees and costs.

## COUNT VIII
## COMMON LAW FRAUD, DECEIT, AND/OR MISREPRESENTATION
## (On Behalf of Plaintiffs and the Class)

204. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

205. Plaintiffs bring this cause of action individually and on behalf of all Class members.

206. Defendant made affirmative representations to users through its Privacy Banner, Cookie Settings, and related disclosures that users could decline all non-necessary cookies.

207. Defendant represented that exercising those options would limit or prevent the deployment of Tracking Tools, including analytics and marketing cookies, and would stop the transmission of users' browsing activity, interactions, and related data to the Tracking Entities.

208. Defendant made these representations at the time users first accessed the Website and again when users were prompted to review and confirm their cookie preferences.

209. These representations were false and misleading. Defendant continued to deploy the Tracking Tools to intercept and collect Plaintiffs' and the Class members' Sensitive Information and transmit the same to the Tracking Entities after users opted out.

210. Defendant knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and configured the Tracking Tools, and determined how those tools operated in relation to users' expressed privacy choices. Defendant also received reports on the Tracking Tools

functionality, which would have alerted Defendant to decreased information intake if its Tracking Tool scheme was functioning as described.

211. Defendant had the technical ability to prevent data transmissions and to configure the Website so that non-essential tracking ceased when users declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites to block, defer, or condition the loading of non-essential Tracking Tools based on users' preferences, and Defendant could have implemented such measures.

212. Defendant made misrepresentations with the intent to induce reliance by users, including Plaintiffs, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data to the Tracking Entities for its own commercial benefit.

213. Plaintiffs and the Class members reasonably and justifiably relied on Defendant's misrepresentations by continuing to use the Website and by exercising the decline controls instead of avoiding the Website, withholding information, or taking additional steps to protect their privacy.

214. Plaintiffs' and the Class members' reliance was reasonable because Defendant presented the Privacy Banner and Cookie Settings as mechanisms for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

215. As a direct and proximate result of Defendant's fraudulent conduct, Plaintiffs and the Class members suffered damages, including loss of privacy, loss of control over their personal information, and diminution in the value of their personal data. Plaintiffs and the Class members suffered injury, including unauthorized disclosure of their communications, loss of control over their personal information, and loss of the privacy protection Defendant represented it would provide.

216. Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize users' data through the Tracking Tools despite representing that such practices would cease upon declining.

217. Plaintiffs and the Class members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, punitive damages where available.

**COUNT IX**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

218. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

219. Plaintiffs bring this cause of action individually and on behalf of all California Subclass members.

220. Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiffs' and the Class members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

221. It is unjust that Defendant retains those benefits under circumstances in which the information was collected and transmitted to the Tracking Entities in breach of the representations made to users and without valid consent.

222. Plaintiffs and the Class members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiffs and the Class members. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiffs and the Class members are entitled to the relief set forth below.

**PRAYER**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a. An order certifying the class and making all appropriate class management orders;
b. For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representative of the Class and the California Subclass and Plaintiffs' counsel as Class Counsel;
c. For an order declaring the Defendant's conduct violates the statutes referenced herein;

d. For an order finding in favor of Plaintiffs, the Class, and the California Subclass, on all counts asserted herein;

e. An award of statutory damages or penalties to the extent available;

f. For damages in amounts to be determined by the Court and/or jury;

g. For pre-judgment interest on all amounts awarded;

h. For an order of restitution and all other forms of monetary relief;

i. An award of all reasonable attorneys' fees and costs; and

j. Such other and further relief as the Court deems necessary and appropriate.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs demand a trial by jury of all issues so triable.

Dated: September 25, 2026

Respectfully submitted,

*/s/Jason M. Ingber*
Jason M. Ingber (SBN 318323)
**LEVI & KORSINSKY, LLP**
3580 Wilshire Boulevard, Suite 1260
Los Angeles, California 90010-2513
Telephone: (213) 805-8373
Email: jingber@zlk.com

Mark S. Reich*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com

*Counsel for Plaintiffs*

**pro hac vice* forthcoming